IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JAMES BUCHANAN                                                                            PLAINTIFF

v.                                          Civil No. 10-4001

TYSON FOODS, INC.                                                                       DEFENDANT

**MEMORANDUM OPINION**

      Plaintiff, James Buchanan, brings this employment discrimination action pursuant to 42 U.S.C. § 1981.  Buchanan contends he was subjected to a hostile work environment and wrongfully terminated because of his race.  On December 22, 2010, Defendant filed a motion for summary judgment (Doc. 11).  Plaintiff filed a response (Doc. 15) on January 21, 2011.  The motion is now ready for decision.

**I.  Background**

      Plaintiff worked for Defendant for twenty-seven years.  *Deft's App.* pgs. 2-3.  Pat Pressler was Plaintiff's direct supervisor and acted in that capacity the entire time Plaintiff worked in maintenance.  *Deft's App.* at pgs. 5-6.  Pressler's supervisor was Darrell Willhite, the Further Processing Maintenance Manager.  *Id.* at pg. 5 & 38.  Willhite reported to Keith Smith, the Production Engineer for Defendant's facility in Nashville, Arkansas.  *Id.* at pg. 45.  Plaintiff testified he was never written up until Smith, a new plant manager, and a new assistant plant manager all started at the same time.  *Deft's App.* at pg. 6.

      Plaintiff's position was Line Two Formax Mechanic in Further Processing.  *Deft's App.* at 38.  His job was to ensure that all machinery on the line was operating correctly and, as time permitted, to perform other maintenance duties as assigned.  *Id.*

Willhite supervised Plaintiff from November 1999 until his termination in January 2008. *Deft's App.* at pg. 38. According to Willhite, during this time he interacted with Plaintiff on a regular basis. *Id.* Willhite indicates Plaintiff consistently displayed a negative attitude toward co-workers and supervisors. *Id.* Willhite verbally counseled Plaintiff about his poor attitude and lack of teamwork on "several" occasions. *Id.* at pgs. 38-39. Willhite asserts Plaintiff refused to assist other employees with their work and refused to ask other employees for assistance when he needed it. *Id.* at pg. 39.

Plaintiff, however, states that he repeatedly asked for help and assisted other mechanics when he could. *See e.g., Deft's App.* at pgs. 6, 9-10. He asserts that other lines would have two or more mechanics working on them and that he was the sole mechanic on his line. *Id.* Despite having asked Smith, Willhite, and Pressler for help, Plaintiff states that nothing was done. *Id.* After he asked Willhite for help, Plaintiff maintains the written disciplinary actions began. *Id.* at pg. 10.

Smith supervised Plaintiff from June 20, 2005, until his termination in January 2008. *Deft's App.* at pg. 45. Smith indicates that Plaintiff consistently displayed a negative attitude toward both his co-workers and his supervisors. *Id.* Smith was aware of the fact that Plaintiff had been verbally counseled. *Id.* However, based on Smith's observations, Plaintiff was not receptive to the counseling and continued to display a negative attitude. *Id.*

Preventive maintenance was done each weekend. *Deft's App.* at pg. 3. Plaintiff testified that he kept notes during the week of what machines needed to be repaired. *Id.* He also received a printed preventative maintenance order identifying the machines he was to work on. *Id.* The order also contained an estimate of the amount of time the repair would take. *Id.* Once he completed the

work order, Plaintiff was to enter his time in the database (referred to as SAP) to show the work had been done. *Id.*

Defendant utilizes a progressive disciplinary policy under which a "team member" who violates company policy may receive discipline ranging from a verbal counseling session to discharge. *Deft's App.* at pgs. 38 & 41. Employees may also receive written warnings that may result in suspension from work depending on the severity of the infraction. *Id.* Under Defendant's disciplinary policy, a fourth written warning for violation of any company policy, excluding the attendance policy, within twelve months results in the employee's termination. *Deft's App.* at pg. 3 & 38. Plaintiff was aware of the policy. *Id.*

Plaintiff knew that Defendant had a policy forbidding racial harassment or discrimination. *Id.* at pg. 18. In fact, from 2002 to 2007, each year he was provided with a copy of the policy and acknowledged receipt by his signature. *Id.* at pg. 36. In 2006, he received training on the harassment/discrimination policy. *Id.* The policies provided different avenues for employee complaints and included phone numbers. *Id.*

On June 1, 2007, Plaintiff received his first disciplinary letter issued by Smith. *Deft's App.* at pgs. 28 & 47. The letter indicated that Plaintiff gave an inappropriate response to a production supervisor when asked about the estimated time when a piece of equipment would be ready. *Id.* The letter indicates Plaintiff's reply was: "When I get it ready." *Id.* Plaintiff was "retrained on the dialogue to be used in the future" when asked similar questions. *Id.* Plaintiff maintains that he said the machine would be ready when production got ready. *Id.*

The second disciplinary letter is dated December 21, 2007, and was issued by Willhite. *Deft's App.* at pgs. 28, 39 & 43. This write up occurred after Plaintiff engaged in a verbal altercation

with a member of management and took a tool out of the worker's hand. *Id.* at pg. 8. Plaintiff indicated that it was his tool and that he didn't consider it disrespectful. *Id.* At the time, Plaintiff testified he needed to use the channel locks and his request for their return had been denied even though the tool was not being used. *Id.* at pgs. 8-9. Plaintiff indicates that the individual involved, Janeiro, was being disrespectful by calling him a monkey. *Id.*

The third written warning was issued by Jerry White and is dated December 28, 2007, but the incident date was December 26, 2007. *Deft's App.* at pgs. 28 & 44. The warning was issued after line two had been out of production for forty-five minutes because of multiple problems. *Id.* at pgs. 28, 39 & 44. The letter indicated that Plaintiff failed to notify his supervisors of the problems, refused assistance from a supervisor, and waived his hand in a dismissive way towards his supervisor. *Id.* When he went to Smith's office to discuss this write up, Plaintiff testified Smith "told me that I could save everybody a lot of problems if I would just go ahead on and quit now because he was going to fire me anyway." *Deft's App.* at pg. 7.

The fourth written warning came after Plaintiff was scheduled to perform preventative maintenance on the 2-1 Formax machine on Sunday, January 20, 2008. *Deft's App.* at pg. 29 & 39. The letter was issued by Willhite who had been called in to investigate the problem with the Formax machine. *Id.* at pg. 39. It stated that Plaintiff did not do adequate preventive maintenance of the 2-1 Formax over the weekend. *Id.* at pg. 29. On Monday, the machine would not start because the "I/O module number seven" was not installed. *Id.* This kept the plunger from operating. *Id.* Additionally, the "LP directional valve had been left off." *Id.* As this was the fourth written warning within a twelve month period, Plaintiff was terminated. *Id.*

Plaintiff testified that he replaced the gearbox on the 2-1 Formax and put it back in service and tested. *Deft's App.* at pg. 4. The supervisor on duty that weekend was Pressler. *Id.*

According to Plaintiff, Pressler observed him taking the gear box out and putting it back in. *Id.* at pg. 4. After he shut it down, Plaintiff testified that the machine would not be used again until Monday morning. *Id.*

Beginning on the following Monday, Plaintiff was on vacation for twelve days. *Deft's App.* at pg. 4. The morning he returned to work, Plaintiff was advised by Willhite that he had been written up while he was on vacation and was probably terminated. *Id.* at pg. 5. After receiving his fourth written warning, in accordance with policy, Plaintiff was terminated. *Deft's App.* at pg. 3. He was told that he received the warning because he had removed a module from the control panel of the 2-1 Formax. *Id.*

Plaintiff testified that no derogatory remarks were made by Pressler, Willhite, or Smith. *Defts' App.* at pgs. 5-6. Plaintiff was asked to identify and articulate the ways in which he believed he was discriminated against and harassed. He pointed to the following: (1) when he was called a monkey by a fellow mechanic, Janeiro (June of 2007); (2) the fact that he was always willing to help other mechanics, all of whom were white, on their lines, but the other mechanics were not willing to assist him on his line (unspecified dates but occurred for years); (3) the presence of a hangman's noose in the hydraulic room for approximately three weeks and the fact that he was told by a fellow worker that someone is getting an old-fashioned lynching (three to six months before Plaintiff's termination); (4) the presence of a cross that said Ku Klux Klan on it in the bathroom Plaintiff used each day (entire time he worked at Defendant's facility although it was painted over a number of times); (5) being told by a white mechanic, Kelly Scott, that he had a white man's job

(date unspecified but Scott worked there in the 1980's and 1990's); (6) a Rodney King comment was made by Joe Green (four to five years ago); (7) shot at three times in the parking lot (approximately ten or eleven years ago); (8) a nephew of one of the supervisors allegedly said he was going to kill Plaintiff and was sent home by Willhite (unspecified date); (9) a comment by Kelly Scott that whites and blacks should not mix (unspecified date during the 1980's or 1990's); (10) being called a "boy" by both Kelly Scott in the 1990's and his brother Danny Scott, who worked in supply, "somewhere" around 2000; (11) being told by a supervisor, Kenny Whisenhunt, that he was a "card holder of the Ku Klux Klan (unspecified date but was identified as being involved in an incident that occurred in the mid 1990's. *Deft's App.* at pgs. 9, 14, 16, 18, 20, 23, 34-36.

Although he did not report race discrimination under the Discrimination/Harassment Policy or specifically state he believed he was being discriminated or harassed because of his race, Plaintiff maintains that he mentioned some of the incidents outlined above to supervisory employees. *See Deft's App.* at pg. 15 (mentioned a noose being in the hydraulic room to Pressler); *Id.* at pg. 9 (told Smith that he had been called a money or an ape); and the Ku Klux Klan graffiti that kept appearing on the bathroom wall. Plaintiff maintains that the response from management was to do nothing.

## II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Under this standard, the inquiry is not whether the evidence favors one side or the other, but "whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). When considering a summary judgment motion, the Court

"must view the evidence 'in the light most favorable to the nonmoving party.'" *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 445 (8th Cir. 2008). To defeat a motion for summary judgment, however, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." *F.D.I.C. v. Bell*, 106 F.3d 258 (8th Cir. 1997). "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Binkley v. Entergy Operations, Inc.*, 602 F.3d 928, 931 (8th Cir. 2010).

### III. Discussion

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). This right "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Here, Plaintiff alleges that he was terminated on the basis of his race and subjected to a racially hostile work environment during his employment with Defendant.

*Race Discrimination Claim*

Section 1981 race discrimination claims are analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See e.g., Roark v. City of Hazen*, 189 F.3d 758, 761 (8th Cir. 1999). In general, the elements of a

*prima facie* case require the Plaintiff to demonstrate:  (1) he is a member of a protected group; (2) he was meeting his employer's legitimate job expectations; (3) he was subjected to an adverse employment decision; and (4) similarly situated employees outside the protected class were treated differently.  *Chism v. Curtner*, 619 F.3d 979, 983 (8th Cir. 2010)(citations omitted).  "The fourth element of a *prima facie* discrimination case also can be met if the employee provides 'some other evidence that would give rise to an inference of unlawful discrimination.'"  *Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1049 (8th Cir. 2010).

Once Plaintiff satisfies his *prima facie* case, the burden shifts to Defendant to come forward with a legitimate, nondiscriminatory reason for taking the allegedly discriminatory action. *Id.* (citations omitted).  Finally, if Defendant is able to provide such a reason, the burden shifts back to Plaintiff to demonstrate that Defendant's proffered explanation is mere pretext for discrimination. *Id.* (citations omitted).

Assuming the existence of the first three elements of the *prima facie* case, Defendant maintains Plaintiff cannot establish a *prima facie* case because he cannot show that a similarly situated non-African-American was treated differently.  In opposition, Plaintiff points to no similarly situated individuals who were treated differently.  Instead, Plaintiff notes he was the only African-American maintenance man at the time of his termination.  He takes the position that he was treated differently in the terms and conditions of his job throughout his entire twenty-seven years.  In particular, he makes the following assertions:  he was not allowed to work overtime when other white maintenance employees were; he was singled out to clean on occasions when other maintenance employees were not; he was subjected to racial slurs, demonstrations, threats, and

graffiti throughout his entire tenure; and his white co-workers refused to offer him assistance and when he brought this to management's attention they were indifferent or even hostile.

"The test to determine whether individuals are similarly situated is rigorous and requires that the other employees be similarly situated in all relevant respects before the plaintiff can introduce evidence comparing [himself] to the other employees." *Chism*, 619 F.3d at 984 (internal quotation marks and citations omitted). A showing that "the employees engaged in the same or similar conduct, but are disciplined in different ways" is required. *Norman v. Union Pacific R.R. Co*. 606 F.3d 455, 461 (8th Cir. 2010).

In this case, the gist of Plaintiff's argument is that there were no "similarly situated" employees. He does not suggest that Defendant shifted its explanation of the employment decision. *See e.g., Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) ("Evidence of pretext, normally considered at step three of the *McDonnell Douglas* analysis, can satisfy the inference-of-discrimination element of the prima facie case") ; *Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC,* 471 F.3d 843, 847 (8th Cir. 2006); *Ledbetter v. Alltel Corporate Servs., Inc.,* 437 F.3d 717, 722 (8th Cir.2006) (employer failed to follow its own policies); *Kobrin v. Univ. of Minn.,* 34 F.3d 698, 703-04 (8th Cir.1994) (employer shifted its explanation of the employment decision). Plaintiff's only evidence of Defendant's failure to follow its own policies involves an incident that occurred some time in the 1990's and an incident where an employee, Carl Carns, refused to do a job. With respect to the latter incident, Plaintiff did not know if Carns was disciplined or not. *Deft's App.* at pgs. 29-31.

The touchstone inquiry of the *McDonnell-Douglas prima facie* case "remains whether circumstances permit a reasonable inference of discrimination." *Lewis v. Heartland Inns of America,*

*L.L.C.*, 591 F.3d 1033, 1040 (8th Cir. 2010).  Taking the facts most favorably to Plaintiff, he has failed to demonstrate the existence of facts sufficient to create an inference of discrimination.  Defendant is therefore entitled to summary judgment on this claim.

### *Hostile Work Environment Claims*

"Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Tademe v. Saint Cloud State University*, 328 F.3d 982, 991 (8th Cir. 2003).  To establish a *prima facie* claim of hostile work environment by non-supervisory co-workers, a Plaintiff must show (1) that he belongs to a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on his membership in a protected group; (4) that the harassment affected a term, condition, or privilege of his employment by creating a hostile work environment; and (5) that the employer knew or should have known about the harassment and failed to take proper remedial action.  *Cross v. Prairie Meadows Racetrack and Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010)(citation omitted); *see also* W*hidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2nd Cir. 2000) (§ 1981 provides cause of action for race-based employment discrimination based on hostile work environment; hostile work environment shown when incidents of harassment occur either in concert or with regularity that can be termed pervasive).  The hostile work environment standard contains both a subjective and an objective component, requiring Plaintiff to make a showing of a working environment "that a reasonable person would find hostile or abusive, and one that he in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998) (citation omitted).

While Plaintiff has identified several instances of alleged harassing conduct, Defendant first maintains that Plaintiff cannot show that unwelcome harassment occurred because he did not complain about the instances, react negatively to them, voice any opinion about them, or otherwise indicate that he in anyway found the incidents offensive or unwelcome. Second, since Plaintiff's claim is primarily based on his co-workers' failure to provide him assistance and his supervisor's failure to make them do so, Defendant maintains that Plaintiff cannot provide any evidence, beyond his own speculation, that this treatment was based on his race. Third, Defendant argues the Plaintiff cannot show that the harassment was sufficiently severe or pervasive to alter the conditions of his employment. Finally, Defendant argues there is no evidence it knew, or should have known, about the alleged harassment and failed to take appropriate action.

In opposition, Plaintiff argues that there were at least two occasions he brought to the attention of his direct supervisors specific instances of racial harassment shortly before his termination. First, he points out that he told Pressler that there was a hangman's noose in the hydraulic room three to six months prior to his termination. *Deft's App.* at pg. 15. Plaintiff asserts the noose remained there for about three weeks after he advised Pressler about it. *Id.* Second, he points out that he told Smith about being called a monkey. *Id.* at pg. 9. According to Plaintiff, it was only after he told Smith about this comment that he was written up for being disrespectful by grabbing his tools out of the other employee's hands. Third, with the exception of periods of time when the bathroom was freshly painted, Plaintiff states the Ku Klux Klan graffiti remained in the bathroom up to the time of his termination. In addition to the two instances that were reported, Plaintiff points to the various other instances that occurred during his years of employment.

While the Court agrees that a hangman's noose, Ku Klux Klan graffiti, and being referred to as a "monkey" or "boy" are overtly racial, it is the Court's duty consider "all of the circumstances" of the workplace environment and not to consider incidents in isolation. *Smith v. Fairview Ridges Hosp.,* 625 F.3d 1076, 1084 (8th Cir. 2010). Moreover, the Court may not "develop a nexus among isolated incidents where no such nexus exists." *Id.*

Although involving reprehensible conduct, the isolated incidents identified by Plaintiff as evidence of racial harassment span from the 1980's to 2008, and come from various co-workers, several of whom left Defendant's employment many years ago. These isolated incidents do not suggest the existence of a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the [Plaintiff's] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). "The standard is a demanding one, and '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not suffice." *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010)(*citing Arraleh v. County of Ramsey,* 461 F.3d 967, 979 (8th Cir.2006)).

Plaintiff's argument that he was the only African-American maintenance man and therefore the jury could draw reasonable inferences from the totality of the circumstances that the disparate treatment he received was hostile and based on race is not pervasive. *See* (Doc. 15 at pg. 16). Other than the graffiti which Plaintiff testified reappeared in the bathroom throughout his employment, the incidents were infrequent, not severe, and did not unreasonably interfere with Plaintiff's work performance. *Cf. Watson,* 619 F.3d at 944 ("We view this case as one involving more than a few

slurs and instances of graffiti"). There is no genuine issue of fact as to whether the acts were severe, pervasive, or frequent enough to create a hostile work environment.

## IV. Conclusion

Accordingly, Defendant's motion for summary judgment (Doc. 11) will be granted by a separate order entered this same date.

DATED this 8th day of February, 2011.

/s/ *Harry F. Barnes*
HON. HARRY F. BARNES
UNITED STATES DISTRICT JUDGE